UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TRAVIS R. MCPEEK,<br><br>                    Plaintiff,<br><br><br>          vs.<br><br>CO MEYERS, CORRECTIONAL OFFICER<br>AT MIKE DURFEE STATE PRISON, IN HIS<br>INDIVIDUAL AND OFFICIAL CAPACITY;<br>CO LUCERO, CORRECTIONAL OFFICER<br>AT MIKE DURFEE STATE PRISON, IN HIS<br>INDIVIDUAL AND OFFICIAL CAPACITY;<br>UM KLIMEK, EAST CRAWFORD UNIT<br>MANAGER AT MIKE DURFEE STATE<br>PRISON, IN HIS INDIVIDUAL AND<br>OFFICIAL CAPACITY; LT. DYKSTRA,<br>OFFICER AT MIKE DURFEE STATE<br>PRISON, IN HIS INDIVIDUAL AND<br>OFFICIAL CAPACITY; UNKNOWN MAIL<br>ROOM OFFICER(S), CORRECTIONAL<br>OFFIER(S) AT MIKE DURFEE STATE<br>PRISON, IN HIS/HER INDIVIDUAL AND<br>OFFICIAL CAPACITY; WARDEN BRENT<br>FLUKE, WARDEN AT MIKE DURFEE<br>STATE PRISON, IN HIS INDIVIDUAL AND<br>OFFICIAL CAPACITY; AND WARDEN<br>DARIN YOUNG, WARDEN AT THE "HILL"<br>AND/OR SIOUX FALLS PRISON, IN HIS<br>INDIVIDUAL AND OFFICIAL CAPACITY.<br><br>                    Defendants. | 4:20-CV-04078-RAL<br><br><br><br><br><br><br><br>OPINION AND ORDER GRANTING IN<br>PART AND DENYING IN PART<br>DEFENDANTS' DYKSTRA, FLUKE,<br>KLIMEK, LUCERO, MEYERS, YOUNG,<br>AND UNKNOWN MAIL ROOM<br>OFFICER(S) MOTION FOR SUMMARY<br>JUDGMENT |

Travis McPeek is currently incarcerated at the Mike Durfee State Prison in Springfield,

South Dakota.  McPeek, who is pro se, sued several named and unnamed Defendants under 42

U.S.C. § 1983 alleging violations of his constitutional rights.  Doc. 1.  This Court screened

McPeek's complaint under 29 U.S.C § 1915A, dismissing it in part and directing service upon

the remaining defendants.  Doc. 6.  This Court previously granted summary judgment to

Defendant Mark Payer on McPeek's access-to-courts claim.  Doc. 68.  The claims that survived

screening and remain pending are: (1) McPeek's retaliation claim (Count I) against Defendants

Klimek, Meyers, Dykstra, and Lucero, in their individual capacities and official capacities (for

only injunctive relief); (2) McPeek's mail policies claims (Counts II and III)  against Defendant

Fluke and the Unknown Mail Room Officers, in their individual capacities and official capacities

(for only injunctive relief); and (3) McPeek's conditions of confinement claims (Counts XII and

XIII) against Defendant Young,  in his individual capacity and official capacity (for only

injunctive relief).

Defendants Dykstra, Fluke, Klimek, Lucero, Meyers, Young, and Unknown Mail Room

Officer(s) moved for summary judgment on all remaining claims.  Doc. 70.  McPeek filed a

Motion to Strike, Doc. 91, and a Motion to Introduce New Evidence, Doc. 93, both of which

Defendants oppose, Docs. 94–95.  For the reasons stated below, Defendants' Motion for

Summary Judgment is granted in part and denied in part, McPeek's Motion to Strike is denied,

and McPeek's Motion to Introduce New Evidence is denied.

## FACTUAL BACKGROUND[1]

---

[1] Defendants complied with Rule 56.1(A) of this Court's Local Rules by filing a statement of material facts along with their motion for summary judgment.  Doc. 80.  Civil Local Rule 56.1(B) required McPeek to "respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record."  D.S.D. Civ. LR 56.1(B); see also Fed. R. Civ. P. 56(e)(2) (stating that the court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)").  McPeek responded to Defendants' statement of undisputed material facts pursuant to Local Rule 56.1(B).  Doc. 85.  McPeek and Defendants then filed a series of additional responses and motions.  See Docs. 89–95.  To ensure that the facts are viewed in the

I.      **Retaliation Claim (Count I)**

McPeek alleges that on May 16, 2018, Defendant CO Meyers inappropriately touched him when he entered the East Crawford Unit at the Mike Durfee State Prison (MDSP). Doc. 1 at 8. Specifically, McPeek alleges that as he entered the building, CO Meyers approached him and stuck his hand down the collar of McPeek's shirt, touching McPeek's chest area with his bare hands. Id. According to McPeek, CO Meyers claimed that he touched McPeek's chest area because he believed McPeek had a new tattoo. Id. McPeek contends that CO Meyers "touched [him] in . . . a sexual manner that made [McPeek] feel very uncomfortable." Id.

On May 18, 2018, McPeek submitted an Informal Resolution Request stating that on May 16, 2018, CO Meyers "stuck his hand down the collar of my shirt touching my right chest area and neck. His excuse was he was looking at my tattoo. Meyers touching me was uncomfortable, gross, and degrading. Meyers is always chewing sunflower seeds pulling them out of his mouth leaving his hands full of saliva and then touches me exposing me to his bodily fluids." Doc. 80 at ¶ 24; Doc. 85 at ¶ 24; Doc. 71-1 at 7. On May 21, 2018, Defendant Klimek, East Crawford Unit Manager, reported McPeek's Informal Resolution Request as a PREA (Prison Rape Elimination Act) complaint against CO Meyer. Doc. 80 at ¶ 25; Doc. 85 at ¶ 25.

---

light most favorable to McPeek as the non-moving party, this Court draws the facts not only from Defendants' statement of undisputed material facts, but also from McPeek's complaint, exhibits, and other filings pertaining to Defendants' motion for summary judgment. See Nickens v. White, 622 F.2d 967, 971 (8th Cir.1980); Roberson v. Hayti Police Dep't, 241 F.3d 992, 995 (8th Cir. 2001) ("[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion."); see also McClanahan v. Young, 4:13–CV–04140–RAL, 2016 WL 520983, at *1, 2016 U.S. Dist. LEXIS 13978, at *1-2 (D.S.D. Feb. 5, 2016). This Opinion and Order, of course, makes no findings of fact and sets forth the facts in the light most favorable to McPeek, as it must in ruling on Defendants' motion for summary judgment.

Captain Daniel Sestak, an Administrative Lieutenant and PREA Investigator, opened an investigation of McPeek's complaint against CO Meyers. Doc. 80 at ¶ 26; Doc. 85 at ¶ 26.

On May 21, 2018, while McPeek was in the day hall playing pool, he was called to the desk. Doc. 86 at ¶ 6. When McPeek went to the desk, Defendant Lucero told him to "cuff up." Id. McPeek felt shocked, nervous, and scared because he had not done anything wrong or broken any rules. Id. McPeek asked Lucero what he had done wrong, and Lucero responded that he did not know. Id. Lucero walked McPeek, who had been handcuffed, to health services. Id. As they were walking, McPeek contends that Lucero was "kind of twisting the cuffs slightly." Id. McPeek informed Lucero that the handcuffs were too tight and causing pain and that Lucero did not need to twist the handcuffs. Id.

When they arrived at health services, a medical staff member asked McPeek if he had any injuries. Id. at ¶ 7. McPeek responded that the handcuffs were causing pain because they were tight and aggravating a preexisting ulnar nerve injury. Id. McPeek asked why he was at health services, but the medical staff member did not know. Id. Lucero walked McPeek back to his unit, and McPeek continued to complain that the handcuffs were hurting him. Id.

Lucero took McPeek to the segregation cells in his unit and placed him in a small space McPeek believes was the shower area. Id. at ¶ 8. After confining McPeek in the area, Lucero instructed McPeek to turn around and extend his cuffed wrists through an open area of the door. Id. McPeek complied, and Lucero removed the handcuffs. Id. McPeek contends that Lucero had a difficult time removing the cuffs because they were so tight. Id. McPeek was instructed to remove and provide his clothes to the officers. Id. McPeek complied and continued to ask why he was being placed in segregation. Id. The officers did not provide a reason. Id. McPeek was

4

put into a suicide vest, which he contends was very degrading and uncomfortable, and placed in a disciplinary segregation cell. Id.

In the segregation cell, McPeek was provided with a suicide blanket, a suicide mattress, and single fold toilet paper. Doc. 80 at ¶ 34; Doc. 85 at ¶ 34. McPeek had access to a finger toothbrush and shower each morning if he made a request. Doc. 80 at ¶ 35; Doc. 85 at ¶ 35. McPeek asked to call his lawyer, but that request was denied. Doc. 86 at ¶ 9. He requested his legal work because he was in the appeal process of a case, but this request was denied. Id. His request for a pencil and a paper was denied. Id. He asked if he could make a phone call to his mother on her birthday, and this request was also denied. Id.

When Defendant Klimek, the unit manager, was making rounds, McPeek contends that he asked Klimek why he was in segregation and could not "make any phone calls, have a bible or normal clothes, bedding[,] or hygiene." Id. at ¶ 10. According to McPeek, Klimek told him that he did not know why he was in segregation, but confirmed that McPeek's privileges were denied. Id.

On May 23, 2018, mental health staff spoke with McPeek during rounds of the segregation unit. Doc. 80 at ¶ 53. McPeek reported that he did not know why he was in the segregation unit and that no one would tell him why. Doc. 71-6 at 6. Defendants contend that McPeek did not report any mental health issues, but did express concern about not knowing why he was in segregation. Doc. 73 at ¶ 5. McPeek contends that he reported that he was "completely stressed out" by his situation. Doc. 86 at ¶ 11.

In his affidavit, McPeek asserts that Lt. Sestak eventually told him why he was in segregation. Id. at ¶ 12. In his Complaint, however, McPeek alleges that Defendant Klimek told him that he was in segregation for his protection because he had filed a grievance against CO

5

Meyers. Doc. 1 at 8. When McPeek was informed of the reason he was in segregation, he expressed concern that he was being punished and mistreated. Doc. 86 at ¶ 12.

The South Dakota Department of Corrections (DOC) has in place a PREA Response and Investigation of Sexual Abuse/Harassment policy. See Doc. 71-2 ("the PREA Policy"). Defendants contend that the PREA Policy requires that the alleged accuser and alleged victim be separated. Doc. 80 at ¶ 29; Doc. 89 at ¶ 29. Defendants further contend that McPeek was placed in a segregation cell to ensure that there would be no contact between McPeek and Meyers. Doc. 80 at ¶ 30. At MDSP, according to Defendants, placing McPeek in a segregation cell was the only available alternative to separate McPeek and Meyers because the cells at MDSP are open, similar to a dormitory setting. Doc. 90 at ¶ 14. Prisoners can come and go as they please, except at night or when the day hall is closed. Id. McPeek's property was restricted and he was, in essence, on suicide watch, according to Defendants, because it is standard policy to monitor an inmate's mental well-being and prevent any self-harm during the first forty-eight hours in segregation. Doc. 80 at ¶¶ 33-34; Doc. 90 at ¶ 19.

As part of the investigation of McPeek's PREA complaint, Lt. Sestak interviewed McPeek. Doc. 80 at ¶ 39. According to Sestak, during the interview, McPeek told him that Meyers did not touch his chest area, as McPeek initially had indicated, but may have contacted his neck area by his shirt collar. Doc. 74 at ¶ 15. McPeek denies saying to Sestak that Meyers did not touch his chest. Doc. 86 at ¶ 13. Sestak also reviewed video evidence of the incident. Doc. 80 at ¶ 43. According to Sestak, the video demonstrated that Meyers did not touch McPeek's chest area, but may have shown some contact in the neck area. Id. At the conclusion of the investigation, Sestak determined that the incident was unfounded. Doc. 80 at ¶ 44; Doc. 85 at ¶ 44. Once the investigation ended, McPeek was released from the segregation cell. Doc.

6

80 at ¶ 44; Doc. 85 at ¶ 44. McPeek was in segregation from 2:30 pm on May 21, 2018 until 1:14 p.m. on May 23, 2018. Doc. 80 at ¶ 38. Defendants contend the placement was for McPeek's protection, id., but McPeek disputes that the placement and accompanying privilege restrictions were necessary for his protection, see, e.g., Doc. 85 at ¶ 38. McPeek asserts that he was placed in segregation as retaliation for filing a grievance about Defendant Meyers inappropriately touching his chest. Doc. 1 at 8.

## II.    Mail Policy Claims (Counts II and III)

The DOC has a policy in place regarding inmate correspondence. Docs. 71-3, 71-4. The policy regulates the physical form of non-legal mail that inmates can receive:

> Incoming envelopes must be white in color and may only include an affixed canceled postage stamp or postage label and return address, which may only be printed, typed or hand-written in ink (excluding metallic pens) on the envelope. Padded envelopes are not allowed. Stickers, tape, self-adhesive labels (return address labels), and sealing wax or sticky, foreign substances not originally part of the envelope, are not permitted. Envelopes may contain drawing, provided this is in black graphite pencil or ink pen (excluding metallic ink pens). Drawing or marking in crayon, paint, marker or colored pencil or chalk is not permitted. Cancelled postage stamps will be removed by mailroom staff from the envelope to prevent reuse or introduction of contraband. Envelopes that do not meet the criteria will be returned unopened to the sender with a brief description of the reason the envelope was rejected.

Doc. 71-3 at 5 (SDDOC Mail Policy 1.5.D.3, rev. 4/17/18).[2] McPeek contends that between October 2018 and August 2019 mail that was sent to him was rejected and returned to the sender with no notification to McPeek. Doc. 1 at 11; Doc. 86 at ¶¶ 31–32. Between October 10, 2018, and February 13, 2020, thirty pieces of correspondence sent to McPeek were returned to the sender. Doc. 72 at ¶ 9. The reasons for the correspondence being returned included colored envelope/card, postcard, address labels, tape, and incomplete return addresses. Id. The

---

[2] The policy was revised in August 2019 to include exceptions for mail sent by religious and education organizations or attorney-client privileged sources. See Doc. 71-4 at 5.

correspondence that was returned to the sender bore a stamp that stated, "Per DOC policy 1.5.D.3 . . ." with the reason for the return circled. Id. at ¶ 10. The rules against colored envelopes, postage labels, and certain drawings on envelopes were implemented to prevent the introduction of contraband into the prison system. Doc. 72 at ¶¶ 3, 6–8. The prison determined that some people were sending inmates mail covered in synthetic marijuana, and it was easier to detect contraband if mail was on white paper. Id. at ¶ 6. The rules on postage labels were implemented because the prison found that drugs could also be hidden under stickers, labels, and tape. Id. at ¶ 8.

Defendants do not dispute that before August 2019, McPeek was not notified when correspondence sent to him was returned to the sender unopened. Id. at ¶ 11. Since August 2019, however, inmates have received notice when mail is returned to the sender unopened. Doc. 80 at ¶ 75; Doc. 85 at ¶ 75.

McPeek's "biggest complaint" is that he "was never notified of the rejection" of his mail. Doc. 86 at ¶ 31. McPeek contends that he was expecting birthday cards and money from family, as well as correspondence with an unknown number of pen pals, but he did not learn that mail addressed to him had been rejected until the prison changed its policy in 2019. Doc. 85 at ¶¶ 69–74. In Count II of the Complaint, McPeek identifies six individuals who have retained mail addressed to McPeek that MDSP returned to them. Doc. 1 at 11. McPeek speculates that he still has not been notified of the names of all the individuals who sent him mail that was rejected. Doc. 85 at ¶ 58.

### III.     Conditions-of-Confinement Claims (Counts XII and XIII)

McPeek was transferred to the South Dakota State Prison (SDSP) on May 9, 2019, for a parole hearing[3]. Doc. 86 at ¶¶ 1, 17. McPeek was housed at the SDSP until May 29, 2019, when he was transferred back to MDSP. Doc. 80 at ¶¶ 77–78; Doc. 85 at ¶¶ 77–78. At the SDSP, McPeek was housed in cell N90. Doc. 86 at ¶ 17. McPeek alleges the cell was so "tiny and confined" that he could not do a pushup without bumping his head, arms, and body on his bunk or the walls. Doc. 80 at ¶ 77; Doc. 85 at ¶ 77; Doc. 86 at ¶¶ 17–18. According to McPeek, the bunk was almost the same length as the room with a toilet sink combo and two lockers between the bunk and the cell wall, which left approximately 1 ½ to 2 feet to walk. Doc. 86 at ¶ 23. McPeek was housed with another inmate, and McPeek was assigned the top bunk. Id. at ¶ 17. McPeek was housed in a general population cell, and it is not uncommon to have two inmates housed in the general population cells. Doc. 80 at ¶ 80. General population cells are 9 feet, 7 ¼ inches long and 5 feet, 10 ¼ inches wide amounting to 56.224 square feet. Id. at ¶ 81. McPeek claims he had nowhere to write or do legal work other than in his bunk. Doc. 86 at ¶ 17.

McPeek contends that he was confined to his cell for up to 22 ½ hours a day. Id. at ¶ 19. But he does not dispute that he was released for two hours each day for recreation, three times a day for meals, and additional time for programming, classes, and work. Doc. 80 at ¶ 82; Doc. 85 at ¶ 82.

McPeek contends that he "started to get very claustrophobic and having panic attacks[,]" which "gave [him] severe anxiety and chest pains." Doc. 86 at ¶ 18. According to McPeek, he reported to the Unit Coordinator, Stiniky, the issues the small cell was causing "including chest

---

[3] In paragraph one of his affidavit, McPeek asserts that he was transferred to the SDSP in 2018 rather than 2019. See Doc. 86 at ¶ 1. McPeek was housed at the SDSP in May 2019. See Doc. 85-1 at 1-2.

pains, tension, anxiety, claustrophobia, panic attacks, breathing problems, how [he] had no where to write or do [his] legal work, how [he] couldn't even do a push-up, and that [he] was basically having to just stay in [his] bunk all day." Id. at ¶ 20.

McPeek further complains that for over a week there was very loud construction taking place near his cell, with sounds of power tools beating against concrete causing him ear pain and ringing. Doc. 1 at 23; Doc. 86 at ¶ 25. McPeek alleges that he requested ear and breathing protection, but his requests were denied. Doc. 86 at ¶¶ 25–26.

## DISCUSSION

### I.   Defendants' Motion for Summary Judgment

#### A.   Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (citation omitted). There is a genuine issue of material fact if "a reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

### B.     Standard for Section 1983 Liability

McPeek sued Defendants under 42 U.S.C. § 1983 seeking monetary damages and injunctive relief.  Doc. 1.  Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  State officials sued in their individual capacities for monetary damages under § 1983 may be entitled to qualified immunity as a defense.  Qualified immunity "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014) (citation omitted).  To determine whether a government official is entitled to qualified immunity, the court considers (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The court may consider the elements in any order, and if either of the elements is not met, then the official is entitled to qualified immunity.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  McPeek cannot recover monetary damages from Defendants in their individual capacities if Defendants are entitled to qualified immunity.

State officials sued in their official capacities, however, may be sued under § 1983 for injunctive relief, and "[q]ualified immunity does not apply to a claim for injunctive relief." Hamner v. Burls, 937 F.3d 1171, 1175 (8th Cir. 2019).

### C.     Retaliation Claim (Count I)

In Count I of the Complaint, McPeek alleges that Defendants Klimek, Meyers, Dykstra, and Lucero retaliated against him for filing a grievance asserting that Meyers had inappropriately

touched his chest.  Doc. 1 at 8-9.  After he filed the grievance, McPeek was handcuffed, forced to get naked, and placed in a segregation cell.  Id.  McPeek alleges that he was placed in segregation as retaliation to punish him for filing a grievance against Meyers.  Id.  Defendants contend that McPeek was placed in segregation because prison policy required that McPeek be separated from Meyers following McPeek's grievance.  Doc. 71 at 13.  According to Defendants, McPeek was placed in segregation following the grievance for his protection.  Id.  McPeek seeks damages against Defendants Klimek, Meyers, Dykstra, and Lucero in their individual capacities and injunctive relief against these Defendants in their official capacities.

### 1. Exhaustion

Defendants argue that they are entitled to summary judgment on McPeek's retaliation claim because he did not exhaust all administrative remedies before commencing this lawsuit.  Doc. 71 at 5-9; *see also* Doc. 80 at ¶ 15.  McPeek does not dispute that he did not submit a grievance complaining that he was handcuffed too tightly when he was escorted to the segregation cell and was retaliated against from May 21 to May 23, 2018; that while in the segregation cell from May 21 to May 23, 2018, he did not have any toilet paper or anything in his cell; or that while in segregation, he was denied phone calls to his mother and attorney and denied a Bible.  Doc. 80 at ¶¶ 15–19; Doc. 85 at ¶¶ 15–19.  Further, McPeek does not dispute that he is familiar with the DOC's grievance policy.  Doc. 80 at ¶ 20; Doc. 85 at ¶ 20.  However, McPeek contends that his failure to exhaust does not bar his retaliation claim because a correctional officer, Sestak, threatened him with further segregation and loss of privileges if he did not drop his claim against Meyers or if he pursued any further claim regarding the Meyers incident or being put into segregation.  Doc. 85 at ¶ 15, Doc. 86 at ¶ 12.  Sestak denies threatening or intimidating McPeek.  Doc. 90 at ¶¶ 11, 24–25.  According to Sestak, an inmate

12

who makes a PREA complaint cannot withdraw their complaint. Id. at ¶ 26. A PREA complaint can be closed only after completion of the investigation. Id.

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. Smith v. Brown, 2018 WL 4658223, at *21, 2018 U.S. Dist. LEXIS 168456, at *64 (D.S.D. Sept. 27, 2018) (citing Jones v. Bock, 459 U.S. 199, 211 (2007)). "It is reversible error for the district court to proceed to the merits of a prison condition claim if the prisoner has not exhausted all his available remedies." Kader v. Dooley, 2019 WL 4227361, at *4, 2019 U.S. Dist. LEXIS 151004, at *14 (D.S.D. Sept. 5, 2019) (citing Benjamin v. Ward City, 632 F. App'x 301 (8th Cir. 2016) (per curiam)). "Administrative remedies are not available if 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" East v. Minnehaha County, 986 F.3d 816, 821 (8th Cir. 2021) (quoting Ross v. Blake, 576 U.S. 632, 644 (2016)). In such a case, the inmate is not required to exhaust his claims before suing in federal court. Id. (citing Ross, 576 U.S. at 644).

According to the Eighth Circuit, to demonstrate that fear of retaliation excuses an inmate from exhaustion, "there must be some basis in the record from which the district court could determine that a reasonable prisoner of ordinary firmness would have understood the prison official's action to threaten retaliation if the prisoner chose to utilize the grievance system." Id. (quoting McBride v. Lopez, 807 F.3d 982, 988 (9th Cir. 2015)). If, as McPeek asserts, Sestak "told [him] that in order for [him] to get out [he] would have to drop [his] claim against Meyer[s] and not pursue any further claims with regard to the incident with Meyer[s] or . . . being put into

13

segregation or [he] would be further segregated and have all [his] privileges taken again[,]" see Doc. 86 at ¶ 12, a reasonable prisoner of ordinary firmness would have understood this statement to threaten retaliation. Because there is a fact question whether administrative remedies were available to McPeek, Defendants are not entitled to summary judgment on Count I for failure to exhaust.

### 2.    Official Capacity Claims

McPeek seeks injunctive relief against Defendants Dykstra, Klimek, Lucero, and Meyers in their official capacities to prohibit "future forms of harassment and/or retaliation against [him] especially when exercising a constitutional right to not be touched in a sexual harassing manner or for making a legitimate PREA complaint." Doc. 1 at 31. These Defendants are no longer employed by the South Dakota Department of Corrections. Doc. 19 at ¶ 4; Doc. 80 at ¶¶ 4–7. Under Federal Rule of Civil Procedure 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold public office while the action is pending. The officer's successor is automatically substituted as a party." The parties have not identified these Defendants' successors or otherwise attempted to substitute the proper defendants for the official capacity claims. However, because the Court finds that McPeek's claim for injunctive relief on Count I of his Complaint fails, substitution at this stage would be futile.

McPeek bears the burden of establishing that he had standing under Article III of the Constitution to seek injunctive relief. Park v. Forest Serv. of U.S., 205 F.3d 1034, 1036–37 (8th Cir. 2000). To demonstrate standing, McPeek must establish in injury in fact; a causal connection between the injury and the defendants' alleged conduct; and a likelihood that the remedy he seeks will redress the alleged injury. Steel Co. v. Citizens for a Better Env't, 523 U.S.

83, 102–03 (1988).  When a plaintiff is seeking injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." Park, 205 F.3d at 1037.  Evidence that a plaintiff suffered an injury in the past does not alone establish that the plaintiff has standing to seek injunctive relief.  O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects").

In City of Los Angeles v. Lyons, the Supreme Court made clear that a plaintiff must show that "the injury or threat of injury" is "real and immediate" to have standing to seek injunctive relief.  461 U.S. 95, 102 (1983).  A "conjectural" or "hypothetical" threat of injury does not establish standing.  Id.  In Lyons, the plaintiff sought injunctive relief barring police officers from using chokeholds unless suspects were threatening the officers with the immediate use of deadly force.  Id. at 98.  Although Lyons had been subjected to a chokehold in the past and alleged that police officers routinely applied chokeholds when they were not threatened by deadly force, the Supreme Court held these facts fell short of establishing that Lyons faced a real and immediate threat of future harm.  Id. at 105–06.  Because Lyons did not demonstrate that there was a sufficient likelihood that the police would subject him to a chokehold in the future, he did not have standing to seek injunctive relief.  Id. at 105–10.  In this case, McPeek has failed to demonstrate that there is a real and immediate likelihood that he will complain that he has been touched in a sexual harassing manner or make a PREA claim and subsequently be placed in segregation.  See Knox v. McGinnis, 998 F.2d 1405, 1413–15 (7th Cir. 1993) (holding that prisoner's speculation that he could be returned to segregation did not give him standing to seek injunctive relief against prison's use of "black box" restraining device on inmates in

segregation).  Accordingly, Defendants are entitled to summary judgment on McPeek's official capacity claims seeking injunctive relief on Count I.

### 3.      Individual Capacity Claims

To demonstrate retaliation in violation of the First Amendment under 42 U.S.C. § 1983, McPeek must "show (1) that he engaged in protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Spencer v. Jackson Cnty., 738 F.3d 907, 911 (8th Cir. 2013) (quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)).  The retaliatory conduct itself need not be unconstitutional; "the violation is acting in retaliation for the 'exercise of a constitutionally protected right.'" Id. (quoting Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001)).  "[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990) (internal quotation omitted).  Whether there is a causal connection between the protected activity and adverse action is generally a jury question. Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012).

Filing a grievance is a protected activity.  Spencer, 738 F.3d at 913 ("Filing a prison grievance has long been protected First Amendment activity." (internal quotation and citation omitted)).  Transferring an inmate to administrative segregation and restricting his privileges are adverse actions.  Royal v. Kautzky, 375 F.3d 720, 722 (8th Cir. 2004) (finding that prisoner's First Amendment rights were violated when he was placed in administrative segregation for making complaints and filing grievances); Trobaugh v. Hall, 176 F.3d 1087, 1088–89 (8th Cir. 1999) (recognizing that prisoner's First Amendment rights were violated when he was placed in

administrative segregation for three days in retaliation for having filed grievances); Madewell, 909 F.2d at 1206 (stating the prison officials may not worsen a prisoner's living and working conditions in retaliation for their litigation activities). On the basis of the record evidence, the Court finds that there are genuine issues of material facts whether placing McPeek in administrative segregation was motivated, in part, by his exercise of a protected activity—filing a grievance.

Defendants contend that the PREA Policy requires that an alleged accuser and alleged victim have to be kept separate and that McPeek was placed in "protective custody" so that he (the alleged victim) and Meyers (the alleged accuser) would not run into each other. Doc. 80 at ¶¶ 29–30. According to the PREA Policy, a staff member who witnesses an incident of sexual abuse or attempted sexual abuse "will separate the victim and abuser." Doc. 71-2 at 4. McPeek's allegation that Meyers inappropriately touched his chest does not meet the PREA Policy's definition of sexual abuse. Id. at 2. More significantly, however, the Defendants' documents do not describe McPeek's allegation as sexual abuse or attempted sexual abuse. The Defendants' documents label McPeek's allegation as sexual harassment. Doc. 71-1 at 3, 4. As part of his investigation, Sestak did not complete Part 4 of the Sexual Incident Report Form, which applies only to sexual abuse allegations. Id. at 4. The PREA Policy does not address whether the alleged abuser and alleged victim must be separated following a report of sexual harassment. Doc. 71-2. As McPeek notes, if he was placed in administrative segregation to keep him separated from Meyers, "they sure weren't in a hurry." Doc. 85 at ¶ 30. McPeek has presented evidence that he first reported the alleged improper touching on May 17, 2018, see Doc. 86 at ¶ 5, but he was not placed in administrative segregation until four days later, on May 21, 2017, Doc. 85 at ¶ 30. The same section of the PREA Policy that Defendants contend

requires that the alleged abuser and alleged victim be separated also requires that a staff member receiving information or a complaint that an inmate has been the victim of sexual abuse "promptly report the complaint or information to the Officer in Charge (OIC) or his/her supervisor." Doc. 71-2 at 3; Doc. 85 at ¶ 30. Finally, protecting a segregated inmate from retaliation by prison personnel is not one of the valid purposes of administrative segregation. Kelly v. Brewer, 525 F.2d 394, 401 (8th Cir. 1975).

The PREA Policy does permit placing inmates in protective custody in limited situations, but McPeek argues that Defendants have not complied with these policy provisions. See Doc. 85 at ¶ 30. According to the PREA policy, "[i]nmates . . . who are alleged to have suffered from sexual abuse in the facility will not be placed in involuntary protective custody, unless an assessment of all available alternatives has been made and a determination has been made that there is no available alternative means of separation from likely abusers." Doc. 71-2 at 10. As previously noted, it is not clear to the Court that the PREA Policy permits protective custody in response to a sexual harassment complaint. The PREA Policy requires documentation of the basis for the staff's concern for the inmate's safety and the reason why no alternative means of separation can be arranged. Id. In this case, neither the PREA Checklist and Report Form nor the Administrative Detention Order document the basis for the staff's concern for McPeek's safety or the reasons why no alternative means of separation can be arranged. Doc. 71-1 at 2–5; Doc. 85-1 at 12. As McPeek notes, the portion of the Administrative Detention Order for documenting separation requirements is blank. Doc. 85 at ¶ 30; Doc. 85-1 at 12.

The PREA Policy expressly provides that "[i]nmates placed in protective custody shall have access to approved programs, privileges, education and work opportunities, as provided to inmates of the same classification." Doc. 71-2 at 10. If there are going to be any restrictions,

18

prison staff is required to document the reason for the limitations.  Id.  McPeek has presented evidence that his privileges were limited.  See Doc. 86 at ¶¶ 8–10.  Again, however, Defendants have not offered evidence of any contemporaneous documentation of the reasons for the limited privileges.   Although Defendants allege that McPeek was in segregation for his own protection, see Doc. 80 at ¶ 38, McPeek disputes this allegation:  "If it's strictly to separate Meyers and Plaintiff, why the "suicide smock", "single fold of toilet paper", "lose [sic] of privileges" and Defendant Correctional Officer Meyers does not work 72 hour shifts so why was Plaintiff involuntary [sic] segregated for 3 days?  Most of that time Meyers was not even working?"  Doc. 85 at ¶ 38.  McPeek asserts that he was subjected to conditions consistent with disciplinary segregation, but he had not broken any rules.  Doc. 86 at ¶ 14.  This evidence creates a genuine issue of material fact as to whether the decision to place McPeek in administrative segregation was motivated in part by the grievance he filed against Meyers.

Defendants argue that even if they violated the PREA Policy, failure to follow prison policy is not a basis for § 1983 liability.  Doc. 89 at ¶ 30.  While failure to follow prison policy, in and of itself, is not actionable under § 1983, McPeek's § 1983 claim is for retaliation in response to McPeek filing a grievance, which can be actionable under § 1983.  Defendants nonetheless argue that the decision to place McPeek in administrative segregation was not retaliatory because prison policy required that McPeek and Meyers be separated.  In essence, Defendants argue that following policy cannot be retaliatory, but cite no authority for this proposition.  Regardless, genuine issues of material fact exist on whether Defendants followed the PREA Policy or misinterpreted or misapplied the policy, leaving a fact issue on whether the true motive for placing McPeek in administrative segregation was, in part, retaliation for the grievance McPeek filed against Meyers.  Viewing the facts in the light most favorable to

McPeek, genuine issues of material fact exist whether the decision to place him in segregation was motivated by the grievance he filed against Meyers.

McPeek contends that Defendants Klimek, Meyers, Dykstra, and Lucero are liable for retaliation. Doc. 1 at 9. He must demonstrate that each defendant was individually involved in the alleged unconstitutional acts to be liable under § 1983. Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805–06 (8th Cir. 2010); see also White v. Jackson, 865 F.3d 1064, 1076 (8th Cir. 2017) ("[A] plaintiff must be able to prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009))). "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be individually assessed." Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006) (citing Doran v. Eckold, 409 F.3d 958, 969 (8th Cir. 2005) (en banc)).

McPeek does not allege and has presented no evidence that Meyers was involved in the decision to place him in administrative segregation or the conditions of his confinement while in administrative segregation.[4] Defendant Lucero transported McPeek to administrative custody, but according to McPeek's affidavit, Lucero told McPeek that Lucero did not know why McPeek was being placed in administrative segregation. Doc. 86 at ¶ 6. Further, McPeek has presented no evidence that Lucero knew that McPeek had filed a grievance against Meyers. Because McPeek has not established that Meyers and Lucero were responsible for the decision to place

---

[4] McPeek's complaint does not include a claim alleging that Meyers is liable for violating his Eighth Amendment right to be free from cruel and unusual punishment based on the alleged inappropriate touching of his chest. See Doc. 1. While there may be factual disputes regarding where Meyers touched McPeek, what McPeek said to Sestak during the PREA investigation, whether McPeek's PREA complaint had merit, and whether McPeek exhausted his administrative remedies related to the PREA complaint, none of these disputes are material because they do not relate to the essential elements of the claims before the Court.

him in administrative segregation, they are entitled to qualified immunity on McPeek's individual capacity claims against them. See Trobaugh, 176 F.3d at 1089 (affirming district court's grant of summary judgment in favor of a defendant when the plaintiff did not present evidence sufficient to create a genuine issue as to the defendant's actual knowledge of and deliberate indifference to the plaintiff's alleged unconstitutional placement in administrative segregation).

McPeek contends and has presented evidence that Dykstra authorized placing McPeek in administrative segregation and that Dykstra knew that McPeek had filed a grievance against Meyers when he issued the authorization. Doc. 1 at 8; Doc. 85-1 at 12; Doc. 71-1 at 2. There is record evidence that after Klimek became aware that McPeek had filed a PREA complaint against Meyers, Klimek informed McPeek that he had been placed in segregation for his protection based on the grievance that McPeek had submitted. Doc. 1 at 8; Doc. 71-1 at 9. There is also evidence that McPeek requested that Klimek permit him to make phone calls and have a Bible, normal clothes, bedding and hygiene, but Klimek refused these requests. Doc. 86 at ¶ 10. As previously noted, whether the PREA Policy in fact required or permitted these privilege restrictions is a genuine issue of material fact. Defendants Dykstra and Klimek are not entitled to qualified immunity, and their motion for summary judgment on McPeek's individual capacity claims against them is denied. See Spencer, 738 F.3d at 912 ("An inmate has a First Amendment right to use prison grievance procedures, and it has been established in our circuit for over twenty years that retaliatory actions for filing a prison grievance are actionable.") (internal quotation omitted).

### 4.     PLRA

The PLRA mandates that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility for mental or emotional injury suffered in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18)." 42 U.S.C. § 1997e(e).  The Eighth Circuit interprets § 1997e(e) "as limiting recovery for mental or emotional injury in all federal actions brought by prisoners." McAdoo v. Martin, 899 F.3d 521, 525 (8th Cir. 2018) (quoting Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004)).  To recover more than nominal damages, "a prisoner must allege or prove more than mental or emotional injury." Id.  Further, the PLRA "require[s] more than a de minimis physical injury." Id. (citing Smith v. Moody, 175 F.3d 1025, 1025 (8th Cir. 1999) (unpublished per curiam)). In Smith v. Moody, 175 F.3d 1025 (8th Cir. 1999) (per curiam), the Eighth Circuit affirmed a Section 1997e(e) dismissal for failure to allege a physical injury.  The Eighth Circuit cited favorably to Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997), which dismissed an inmate's claims because the inmate alleged only a de minimis physical injury.  In Siglar, the Fifth Circuit applied Eighth Amendment standards to determine whether a prisoner had sustained a physical injury as required by Section 1997e(e).  Id.  The Fifth Circuit held that a prisoner who did not seek medical treatment for a sore, bruised ear, which lasted three days after an attack by a correctional officer, did not have the requisite "physical injury" to support a claim for mental or emotional injuries.  Id. at 193–94.

McPeek alleges that he experienced wrist pain when he was placed in handcuffs to be escorted to administrative segregation.  Doc. 86 at ¶ 7.  He contends that the handcuffs aggravated a preexisting ulnar nerve injury.  Id.  But there are no medical records to corroborate his allegation that he suffered any wrist injury due to the handcuffs.  Doc. 80 at ¶ 54.  Transient

22

wrist pain due to handcuffs is, at best, a de minimis physical injury.  Johnson v. Florida Dep't of Corrections, 2021 WL 2211345, at *3, 2021 U.S. Dist. LEXIS 102660, at *7 (N.D. Fla. May 11, 2011) (stating that fleeting pain, mere discomfort, minor cuts, and bruises are typically *de minimis* physical injuries).

In the Complaint, McPeek alleges that Meyers touched his chest in an inappropriate sexual manner.   Even accepting McPeek's allegation as true, he has not alleged the commission of a sexual act, as that term is defined in 18 U.S.C. § 2246.  See Johnson, 2021 WL 2211345, at *4, 2021 U.S. Dist. LEXIS 102660, at 9 (holding that plaintiff's allegation that he was groped through his clothing does not constitute a "sexual act").

McPeek alleges that he experienced "emotional distress and psychological torment" due to the alleged retaliation.  Doc. 86 at ¶ 14; see also Doc. 1 at 9.  Because McPeek alleges only mental or emotional injury and has not alleged a separate physical injury or commission of a sexual act, § 1997e(e) limits his recovery to nominal damages in the event of a finding of liability in his favor on Count I.

## D.   Mail Policy Claims (Counts II and III)

In Counts II and III, McPeek alleges that Fluke (through making the mail policy) and Unknown Mail Officers have violated his First Amendment right of freedom of expression and association as well as the Fourteenth Amendment due process clause.  Doc. 1 at 10–13.  McPeek is seeking monetary damages against Defendants Fluke and Unknown Mail Officers in their individual capacities for the pain and suffering he alleges he suffered because Defendants rejected his mail for not complying with the prison mail policy, which McPeek contends is unconstitutional censorship, and did not provide him notice at the time his mail was rejected.

Additionally, McPeek is seeking injunctive relief against Defendants Fluke and Unknown Mail Officers.

### 1.  Individual Capacity Claims

#### a.  First Amendment

Inmates have a First Amendment right to receive mail.  Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998).  But that "right may be limited by prison regulations that are reasonably related to legitimate penological interests."  Id.  In Turner v. Safley, the Supreme Court held that prison rules and restrictions on First Amendment rights are constitutional only "if [they are] reasonably related to legitimate penological interests."  482 U.S. 78, 89 (1987).  The Turner Court provided four factors to determine whether a prison rule withstands scrutiny:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

Thongvanh v. Thalacker, 17 F.3d 256, 259 (8th Cir. 1994).  This Court must give "considerable deference to the determinations of prison administrators who, in the interests of security, regulate the relations between prisoners and the outside world."  Thornburgh v. Abbott, 490 U.S. 401, 408 (1989) (citation omitted).  Deference is accorded to prison administrators because the realities of running a penal institution are complex, and courts are ill-equipped to deal with problems of prison administration.  Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 136 (1977).  As the Supreme Court observed in Turner, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are the province of the legislature and executive branches of government."  482 U.S. at 84–85.

24

This Court need not apply the <u>Turner</u> factors in this case to evaluate whether the mail policy prohibiting colored envelopes, adhesives, post cards, and certain drawings on envelopes is constitutional. Defendants are entitled to qualified immunity on McPeek's claim for damages because it cannot fairly be said that Defendants were on notice it violated clearly-established constitutional rights to reject mail that arrived in colored envelopes, with adhesives, or other physical attributes that were banned by the policy to keep drugs out of the prison. A right is "clearly established" if the law was sufficiently clear that every reasonable officer would understand that his conduct violated that right. <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589–90 (2018). Although McPeek need not cite a "case directly on point" to show that a right is clearly established, "controlling authority" or a "robust consensus of cases of persuasive authority" must put the "constitutional question beyond debate." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741–42 (2011) (citation and internal quotation marks omitted). McPeek has not provided any authority to support his allegation that a prison mail policy prohibiting colored envelopes, adhesives, or other physical attributes that are banned to prevent contraband from entering the prison is unconstitutional. In fact, this District has previously held that prison officials are entitled to qualified immunity on a claim for rejecting correspondence under the DOC policy banning adhesive labels because the plaintiff made no showing that the prison officials had violated a clearly established right. <u>Bell v. Young</u>, No. 4:21-CV-04134-LLP, 2022 WL 4482855, at *17, 2022 U.S. Dist. LEXIS 177390, at *55 (D.S.D. Sept. 27, 2022). Further, a number of courts have held that return of mail based on physical deficiencies rather than content does not violate a prisoner's First Amendment right to receive mail. <u>Whitington v. Moschetti</u>, 423 F. App'x 767, 772 (10th Cir. 2011) ("[W]e have held that an inmate who challenged a policy of returning correspondence with stickers to the sender had not shown the violation of any

25

constitutional right."); <u>Matthews v. Washington Dep't of Corrections</u>, 2016 WL 1426302, at *4, 2016 U.S. Dist. LEXIS 48536, at *10 (W.D. Wash. Feb. 11, 2016) (stating that return of mail based on a deficiency apparent on the envelope does not implicate the First Amendment); <u>Odom v. Pheral</u>, 2013 WL 1703868, at *8, 2013 U.S. Dist. LEXIS 56377, at *28 (W.D. Ky. Apr. 19. 2013) (holding that allegation that a package was rejected because it was covered in tape fails to state a constitutional violation); <u>Sikorski v. Whorton</u>, 631 F. Supp. 2d 1327, 1348 (D. Nev. 2009); <u>Jeffries v. Snake River Corrs.</u>, 2008 WL 3200802, at *4, 2008 U.S. Dist. LEXIS 60856, at *11-12 (D. Ore. Aug. 4, 2008), <u>aff'd</u>, 362 Fed. App'x 587 (9th Cir. 2010) (prohibiting incoming mail containing stickers or certain adhesives does not violate prisoner's First Amendment right to receive mail).  Defendants are entitled to qualified immunity on McPeek's individual capacity claims alleging that returning non-conforming mail to the sender violated his First Amendment rights.

### b.    Procedural Due Process

McPeek's claim challenging the rejection of non-conforming mail implicates the First Amendment; his claim alleging that he should have been notified of such rejection implicates the Due Process Clause.  In <u>Procunier v. Martinez</u>, 416 U.S. 396, 418 (1974), the Supreme Court held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment."  <u>See also</u> <u>Earl v. Fabian</u>, 556 F.3d 717, 728 (8th Cir. 2009) ("[A]n inmate has a liberty interested protected by the due process clause in uncensored communication.").  That interest having been recognized, "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards."  <u>Bonner v. Outlaw</u>, 552 F.3d 673,

676 (8th Cir. 2009) (citation omitted).  Those procedural safeguards must "include notice to an inmate that the correspondence was rejected."  Id.  Defendants argue that Bonner is distinguishable for two reasons.  First, in Bonner, the Eighth Circuit did not "consider the governmental interest of the conservation of prison resources[.]"  Doc. 71 at 24.  Second, in Bonner, the rejected mail was legal mail, which Defendants contend is entitled to heightened protection under the First Amendment.  Doc. 71 at 25.

Bonner is not distinguishable on the grounds Defendants argue.  As to Defendants' first argument, the Eighth Circuit considered whether a more deferential standard under Turner v. Safley, 482 U.S. 78 (1987), should apply to giving notice of withheld packages and wrote "we doubt Turner's applicability to the restriction of a specific constitutional right, e.g., notice, the Supreme Court has already declared applicable in a given situation."  552 F.3d at 678.  The Eighth Circuit reasoned that in the case of procedural due process, the Supreme Court considered additional burden, one of the Turner factors, when deciding whether a procedural due process right exists.  Id.  The Eighth Circuit did state that "there are no additional burdens placed on prison officials by having to give notice[]", id., but when this statement is reviewed in context, it is clear that the Eighth Circuit was conveying that the burden to prison officials to notify prisoners when packages were rejected would not be additional to the burden to prison officials of notifying prisoners when letters are rejected.  As to Defendants' second argument to distinguish Bonner, the Eighth Circuit's discussion and reasoning was not limited to notice of withholding packages sent by legal counsel.  According to the Eighth Circuit, "[t]he reasoning of Procunier clearly applies to all forms of correspondence, even if the decision only discussed letters.  There is no valid reason for distinguishing between letters and packages; the inmate's liberty interest is the same."  Id. at 680.  Because McPeek's claim that the failure to give him

27

notice of rejected mail alleges violation of a clearly established right, Defendants are not entitled to qualified immunity on this claim.

McPeek alleges that unknown mail room officer(s) and Fluke, the MDSP Warden, are responsible for the mail policy violations. Doc. 1 at 11–12. McPeek has not identified the unknown mail room officer(s), but Defendants have done so. During the time of the alleged mail policy violations, Charissa Warembourg was responsible for processing all incoming mail at MDSP and implementing the inmate correspondence policy. Doc. 72 at ¶¶ 1–2. Accordingly, Charissa Warembourg, in her individual capacity, is substituted as a Defendant in place of the Unknown Mail Room Officer(s), in his/her individual capacity.

McPeek contends that Fluke is liable for the constitutional violations alleged in Counts II and III of the Complaint. Doc. 1 at 11-12. The mail policy McPeek challenges is a DOC policy; the policy is not specific to MDSP. Docs. 71-3; 71-4. McPeek must point to specific facts in the record that create a genuine dispute of material fact regarding whether Fluke was "direct[ly] involve[d] . . . in the formation, implementation, or enforcement of" the DOC Mail Room Policy. Bird v. Mertens-Jones, 4:21-CV-04197-KES, 2023 WL 1785572, at *9, 2023 U.S. Dist. LEXIS 21230, at *25–26 (D.S.D. Feb. 6, 2023) (alternations in original) (quoting Jackson v. Nixon, 747 F.3d 537, 545 (8th Cir. 2014)). McPeek has not done so. Fluke is entitled to summary judgment on McPeek's claims against him in his individual capacity.

### c.   PLRA

In Count II and III of the Complaint, McPeek alleges the violation of his due process rights had caused him "mental and emotional stress." Doc. 1 at 11–12. Because McPeek alleges only mental or emotional injury and has not alleged a separate physical injury, § 1997e(e) limits

28

his recovery to nominal damages in the event of a finding of liability in his favor on his claim alleging a violation of his due process rights due to lack of notice of rejected mail.

### 2.    Official Capacity Claims

McPeek's request for injunctive relief requiring Defendants to provide him notice when his mail is rejected is moot.  As McPeek has admitted, the prison started providing notice of rejected mail to inmates back in 2019.  Doc. 80 at ¶ 75; Doc. 85 at ¶ 75.  While the most recent DOC policy has not been provided to this Court, the current DOC Offender Correspondence policy, mail, which is publicly available online, states that "[o]ffenders are notified when incoming or outgoing letters are withheld in part or in full."  South Dakota Department of Corrections, Policies and Procedures: Policy Number 1.5.D.3 at 4 (Nov. 1, 2022), https://doc.sd.gov/documents/1.5.D.3%20Offender%20Correspondence%20and%20All%20Atta chments%20(11.01.2022%20Rev.%201).pdf (last visited Mar. 24, 2023).  The mere possibility that the prison might discontinue providing inmates with such notice is purely speculative, and a "'conjectural or hypothetical' possibility of future harm is insufficient" to form an active case or controversy for this Court to decide.  Brazil v. Arkansas Dep't of Human Servs., 892 F.3d 957 960 (8th Cir. 2018).

McPeek acknowledges that the prison now scans all incoming mail and provides copies to inmates, ostensibly including mail that would previously have violated the prison's rules on colored envelopes, address labels, and the like.  See Doc. 85 at ¶ 61 ("[T]he prison now scans and gives inmates the printouts of their mail.").  Accordingly, to the extent McPeek seeks injunctive relief directing Defendants to deliver to him non-conforming correspondence, his claim is moot.  Defendant Fluke, in his official capacity, and Unknown Mail Room Officer(s), in

their official capacities, are entitled to summary judgment on McPeek's claims for injunctive relief in Counts II and III.

### E.   Conditions-of-Confinement Claims (Counts XII and XIII)

#### 1.   Exhaustion

Defendants argue that McPeek has not exhausted his claims related to the conditions of confinement at the SDSP from May 9 to May 29, 2019.  Defendants contend that when McPeek was confined at the SDSP, he did not submit a grievance complaining that his cell was so small that he could not do a pushup or do legal work, resulting in mental and emotional stress.  Doc. 79 at ¶¶ 14, 16.  Defendants also contend that McPeek did not submit a grievance complaining that the construction near his cell was loud, causing him ear pain and a headache.  Id.

McPeek asserts that he submitted a kite in the unit coordinator's box on May 15, 2019, requesting two grievance forms.  Doc. 86 at ¶¶ 20.  The next day, the kite was returned to him with the response "see me".  Doc. 85-1 at 2; Doc. 86 at ¶ 20.  When McPeek was released from his cell to go to lunch, he went to the unit coordinator's office, and the unit coordinator provided him two informal resolution forms to file his grievances.  Doc. 86 at ¶¶ 20, 22.  McPeek contends that he completed the informal resolution forms and placed them in the unit coordinator's kite box when he was released from his cell to go to dinner.  Id. at ¶ 22.  On May 17, 2019, McPeek submitted another kite requesting two grievance forms.  Id. at ¶ 25; Doc. 85-1 at 1.  The kite was returned to McPeek the next day with the response "see me".  Doc. 86 at ¶ 25. On May 21, 2019, McPeek explained to the unit coordinator that the construction noise was causing headaches and ear ringing.  Id.  He requested ear protection and breathing protection.  Id. at ¶¶ 25, 26.  The unit coordinator provided McPeek two informal resolution forms for his grievances.  Id. at ¶¶ 26, 27.  McPeek completed and returned both grievance forms on May 21,

2019. Id. at ¶ 27.  McPeek did not receive a response to any of the informal resolution forms he submitted while he was housed at the SDSP. Id. at ¶ 28.  On June 25, 2019, after he had returned to MDSP, McPeek submitted a kite asking why he had not received any responses. Doc. 86 at ¶ 28; Doc. 85-1 at 4.  The kite was returned, stating, "Emailed DW Drieske 6/26". Doc. 86 at ¶ 28; Doc. 85-1 at 4.  McPeek received no other responses.  Doc. 86 at ¶ 28.

Inmates are excused from exhausting administrative remedies when prison officials prevent them from using the procedures or when the official themselves fail to comply with the procedures.  Porter v. Sturm, 781 F.3d 448, 452 (8th Cir. 2015).  If, as McPeek alleges, he submitted informal resolution forms complaining about the size of his cell, construction noise, and airborne construction debris, but prison staff did not respond, McPeek's failure to exhaust may be excused.  Because there is a question of fact whether McPeek's failure to exhaust may be excused, Defendants' motion for summary judgment on Counts XII and XIII on the basis of exhaustion is denied.

### 2.    Official Capacity Claims

In Counts XII and XIII of his complaint, McPeek alleges Darin Young, the former warden for the South Dakota State Penitentiary (SDSP), violated his Eighth Amendment right to be free from cruel and unusual punishment. Doc. 1 at 22–23; Doc. 80 at ¶ 8; Doc. 85 at ¶ 8.  He has sued Young in his individual and official capacity. Doc. 1 at 2–4.  As the Court explained in its 1915A Screening Order, Doc. 6 at 7–8, sovereign immunity precludes McPeek from seeking monetary damages against employees of the South Dakota Department of Corrections, including former Warden Young.  Accordingly, only McPeek's conditions-of-confinement claims for injunctive relief against Young in his official capacity survived 28 U.S.C. § 1915A screening. Id. at 18.  Pursuant to Federal Rule of Civil Procedure 25(d), Teresa Bittinger, the current interim

31

warden of the SDSP, is automatically substituted as a defendant for McPeek's official capacity

claim against former Warden Young.  However, in this case, the substitution is, in effect, futile

because McPeek's claim for injunctive relief based on his conditions of confinement at the SDSP

is moot.  See Doc. 85 at ¶ 97 ("Plaintiff is no longer at SDSP in the small cell with the

construction going on causing excessive noise and debris in his breathing air so Plaintiff does not

seek injunctive relief as to this.").

The Eighth Circuit has consistently held that transfer of a prisoner to a different facility in

which the alleged unlawful conduct no longer exists renders the prisoner's request for injunctive

relief moot.  See Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985).  Because McPeek is

currently housed at MDSP, his request for injunctive relief based on the conditions of his

confinement at the SDSP in May 2019 is moot.  Defendants are entitled to summary judgment on

McPeek's official capacity claims in Counts XII and XIII of his Complaint.

### 3.      Individual Capacity Claims

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane

ones.'"  Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (quoting Farmer v. Brennan, 511 U.S.

825, 832 (1994)).  The Supreme Court has instructed that only "extreme deprivations" that deny

"the minimal civilized measures of life's necessities are sufficiently grave to form the basis of an

Eighth Amendment violation."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation

omitted).  Basic human needs, according to the Supreme Court, include "food, clothing, shelter,

medical care, and reasonable safety[.]"  Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal

quotation omitted).

According to the Eighth Circuit:

> To establish that a prisoner's conditions of confinement violate the Eighth
> Amendment, the prisoner must show that (1) the alleged deprivation is,

32

> "objectively, sufficiently serious," resulting "in the denial of the minimal civilized
> measure of life's necessities," and (2) that the prison officials were deliberately
> indifferent to "an excessive risk to inmate health or safety," meaning that the
> officials actually knew of and disregarded the risk.

Williams, 49 F.3d at 445 (quoting Farmer, 511 U.S. at 834, 837). A "critical factor" in the

Eighth Amendment analysis is the length of time a prisoner is subjected to the allegedly

inhumane conditions. Featherston v. Ball, 2020 WL 12582955, at *4, 2020 U.S. Dist. LEXIS

260245, at *12 (E.D. Ark. Dec. 4, 2020) (citing Smith v. Copeland, 87 F.3d 265, 269 (8th Cir.

1996) (stating that "[c]onditions such as a filthy cell that may be tolerable for a few days are

intolerably cruel for weeks or months")).

     McPeek's allegations regarding the size of his cell are insufficient to establish a violation

of the Eighth Amendment. In Rhodes v. Chapman, 452 U.S. 337, 343–44, 348–50 (1981), the

Supreme Court found that a 63-square-foot cell shared by two inmates was not unconstitutional.

Other courts have found that similarly-sized shared cells do not rise to the level of a

constitutional violation. See Jones v. Goord, 435 F. Supp. 2d 221, 236–38 (S.D.N.Y. 2006)

(shared cells of 50 square feet do not rise to the level of an Eighth Amendment violation); Kurze

v. Bertsch, 477 F. Supp. 2d 1038, 1048–49 (D.N.D. 2007) (cell size as low as 35 square feet did

not constitute cruel and unusual punishment). In Burks v. Teasdale, the Eighth Circuit stated that

"[w]e do not hold categorically that putting two men in a cell with a floor space no larger than 65

square feet is or is not constitutionally permissible. We think that a good deal may depend on

the type of institution involved, the nature of the inmates, and the nature of the confinement

itself." 603 F.2d 59, 63 (8th Cir. 1979). Because it is undisputed that McPeek was confined at

the SDSP for less than three weeks and undisputed that he was released from his cell for two

hours each day for recreation, three times a day for meals, and additional time for programming,

classes, and work, the Court finds that housing McPeek with another inmate in a 56.224 square foot cell is not unconstitutional.

McPeek cites <u>Battle v. Anderson</u>, 564 F.2d 388 (10th Cir. 1977) for the proposition that 60 square feet of living space is the minimum amount of space constitutionally required, <u>see</u> Doc. 85 at ¶ 79.  In <u>Battle</u>, the Tenth Circuit outlined correctional standards established by various groups.  The Supreme Court later considered such standards to "be instructive in certain cases, [but] they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." <u>Bell v. Wolfish</u>, 441 U.S. 520, 543 n.27 (1979).

McPeek's allegations regarding excessive noise due to construction and airborne construction debris are similar to the allegations the Eighth Circuit discussed in <u>Givens v. Jones</u>, 900 F.2d 1229 (8th Cir. 1990).  Givens alleged that while he was an inmate at the Missouri Training Center for Men, his Eighth Amendment rights were violated because he was subjected to loud noise and fumes for eight hours a day for approximately three weeks while renovation work was being done in the area in which he was housed.  <u>Id.</u> at 1231.  The Eighth Circuit held that the district court had erred in denying the defendants' claim for qualified immunity on the Eighth Amendment claim arising out of the construction noises and fumes.  The court stated, "Remodeling and upkeep of institutions and buildings, in and out of prison, is a fact of life that must be faced by most individuals.  Givens' complaint on this fact appears almost specious." <u>Id.</u> at 1234.  Summary judgment therefore enters on McPeek's Eighth Amendment claim regarding construction noise and airborne debris for approximately a week when he was housed at the SDSP.  <u>See</u> <u>Brakeall v. Stanwick-Klemik</u>, 4:17-CV-04101-LLP, 2020 WL 1180727, at *1, 2020 U.S. Dist. LEXIS 42319, at *36 (D.S.D. Mar. 11, 2020) ("Conditions of confinement that cause

mere discomfort or inconvenience do not amount to cruel and unusual punishment." (citation omitted)).

Warden Young is also entitled to summary judgment on McPeek's conditions-of-confinement claims because McPeek has not submitted any evidence that Warden Young was personally involved in the allegedly unconstitutional conditions of confinement which McPeek experienced during his twenty days of confinement at the SDSP. McPeek argues that Defendants were aware that the small cell size and construction were adversely affecting his physical and mental condition based on his complaints to mental health and Unit Coordinator Stiniky, and because of these complaints, Defendants were deliberately indifferent to an excessive risk to his health or safety. See Doc. 85 at ¶ 89. McPeek has not named any mental health providers or Unit Coordinator Stiniky as defendants. Former Warden Young is the only named defendant McPeek alleges is liable for the allegedly unconstitutional conditions of confinement at the SDSP. See Doc. 1 at 22–23. McPeek has not submitted any evidence that Warden Young was aware that McPeek contended that the small cell size and construction were adversely affecting his physical and mental condition. To maintain a claim under § 1983 against Warden Young, McPeek must establish that Warden Young personally violated his constitutional rights. Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014) (citing Ashcroft v. Iqbal, 536 U.S. 662, 676 (2009)). Accordingly, because McPeek has not presented any evidence that Warden Young knew of and disregarded an excessive risk to his health or safety, Warden Young is entitled to summary judgment on McPeek's claim for damages against him in his individual capacity. See id. at 545 ("Our case law is clear that the warden's general supervisory authority over prison operations does not make him liable under § 1983." (citations omitted)).

**II.      McPeek's Motion to Strike (Doc. 91)**

McPeek has moved to strike portions of Defendants' Reply to Plaintiff's Response to

Defendants' Statement of Undisputed Material Facts.  Doc. 89.  Defendants oppose McPeek's

motion.  Doc. 94.  Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike

from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Defendants'

Reply to Plaintiff's Response to Defendants' Statement of Undisputed Material Facts is not a

"pleading" as defined in Rule 7(a).  <u>See</u> Fed. R. Civ. P. 7(a).  Further, the Court does not find

that the matters McPeek seeks to strike are redundant, impertinent, or scandalous.  To the extent

McPeek argues that evidence that the Defendants have submitted in support of their motion for

summary judgment is not relevant to his claims or their defenses, the Court has taken these

arguments into consideration when ruling on Defendants' Motion for Summary Judgment.  For

these reasons, McPeek's Motion to Strike, Doc. 91, is denied.

**III.     McPeek's Motion to Introduce New Evidence (Doc. 93)**.

In their motion for summary judgment, Defendants argue that McPeek did not exhaust his

administrative remedies pursuant to the PLRA, 42 U.S.C. § 1997e(a), by filing grievances

regarding his claim that (1) he was handcuffed too tightly causing pain when he was being

escorted to the segregation cell and was retaliated against from May 21, 2018 to May 23, 2018;

(2) while in the segregation cell from May 21, 2018 to May 23, 2018, he did not have any toilet

paper or anything in his cell; (3) while in segregation from May 21, 2018 to May 23, 2018, he

was denied phone calls to his mother and attorney, and denied a bible; (4) he was appealing the

PREA investigation determination that his complaint was unfounded; (5) while he was at the

SDSP from May 9, 2019 to May 29, 2019, his cell was too small to do a pushup or legal work,

resulting in mental and emotional stress; and (6) there was construction from May 9 to May 29,

2019 near his cell that was loud and caused him ear pain and a headache.  Doc. 71 at 5–9.  In

response to this argument, McPeek filed a motion to introduce new evidence.  Doc. 93.

Specifically, McPeek seeks to introduce grievances dated after the commencement of this action,

Doc. 93-1, which McPeek alleges he did not file earlier because of the threat of further retaliation

for filing a PREA complaint against Defendant Meyers.  Doc. 93 at ¶ 2.  Defendants oppose

McPeek's motion to introduce new evidence.  Doc. 95.

In Johnson v. Jones, 340 F.3d 624 (8th Cir. 2003), the Eighth Circuit stated:

> Under the plain language of section 1997e(a), an inmate must exhaust
> administrative remedies *before* filing suit in federal court. Thus, in considering
> motions to dismiss for failure to exhaust under section 1997e(a), the district court
> must look at the time of filing, not the time the district court is rendering its
> decision, to determine if exhaustion had occurred. If exhaustion was not
> completed at the time of filing, dismissal is mandatory.

Id. at 627.  When determining whether McPeek has exhausted his administrative remedies, the

Court cannot consider any grievances submitted after May 6, 2020, the date McPeek filed his

complaint.  Because the new evidence McPeek seeks to submit is not relevant to any issue before

the Court, McPeek's motion to introduce new evidence is denied.

For the reasons stated above, it is hereby ORDERED:

1.  That Charissa Warembourg, in her individual capacity, is substituted as a defendant

    for the Unknown Mail Room Officer(s), in his/her individual capacity.

2.  That Defendants' Motion for Summary Judgment, Doc. 70, is granted in part and

    denied in part.  Defendants Dykstra, Klimek, Lucero and Meyers are entitled to

    summary judgment on McPeek's official capacity claims against them.  Defendants

    Lucero and Meyers are entitled to summary judgment on McPeek's claims against

    them in their individual capacities.  Defendants Dykstra and Klimek are not entitled

    to summary judgment on McPeek's retaliation claim (Count I) seeking damages

37

against them in their individual capacities, but McPeek, pursuant to 42 U.S.C. § 1997e(e), cannot recover compensatory damages from Defendants Dykstra and Klimek.  Defendant Fluke is entitled to summary judgment on McPeek's claims against him in his individual and official capacity.  Defendant Warembourg is not entitled to summary judgment on McPeek's claim against her in individual capacity due to the failure to provide notice of rejected mail, but McPeek, pursuant to 42 U.S.C. § 1997e(e), cannot recover compensatory damages from Defendant Warembourg.  Defendant Young is entitled to summary judgment on McPeek's claims against him in his individual and official capacity.

3. That McPeek's Motion to Strike, Doc. 91, is denied.

4. That McPeek's Motion to Introduce New Evidence, Doc. 93, is denied.

DATED this 31st day of March, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE